CARPENTER FAMILY INVESTMENTS, LLC, CARPENTER CAPITAL
MANAGEMENT, LLC, TAX MATTERS PARTNER, PETITIONER
*v*. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 30833–08.          Filed April 25, 2011.

P moved for summary judgment on the ground that R's
partnership item adjustments were made after the general 3-
year period of limitations for assessing tax had expired. R
argues that an extended 6-year period of limitations applies.
*Held*: The 3-year period of limitations is applicable. Thus P's
motion for summary judgment will be granted.

*Kevin T. Pearson* and *Eric J. Kodesch*, for petitioner.
*Gary J. Merken*, for respondent.

### OPINION

WHERRY, *Judge*: This case is before the Court on peti-
tioner's motion for summary judgment filed September 28,
2009. Respondent filed an objection to petitioner's motion on
November 20, 2009. Petitioner filed a memorandum in sup-
port of its motion on July 27, 2010. The issue is whether the
notice of final partnership administrative adjustment (FPAA)
challenged in the petition was issued before the applicable
period of limitations for assessing tax had expired. Our deci-
sion turns on whether the general 3-year period of limita-
tions under section 6501(a) or the extended 6-year period of
limitations under section 6229(c)(2) or section 6501(e)(1)(A)

applies. [1] This is an issue of law and may be disposed of by summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure. See also *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992) ("Summary judgment is appropriate if the pleadings and other materials show that there is no genuine issue as to any material fact and a decision may be rendered as a matter of law."), affd. 17 F.3d 965 (7th Cir. 1994); *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988) ("Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials.").

## *Background*

### I. *Undisputed Facts*

The following facts are not in dispute. Petitioner, Carpenter Capital Management, LLC, is a Nevada limited liability company classified as a partnership for Federal income tax purposes. Petitioner is the tax matters partner of Carpenter Family Investments, LLC, an Oregon limited liability company classified as a partnership for Federal income tax purposes with its principal place of business in Salem, Oregon (the partnership).

At the end of its 2000 taxable year the partnership was owned as follows: Tommie Carpenter, 0.5 percent; Virginia Carpenter, 0.5 percent; petitioner, 99 percent. During the taxable year ending December 31, 2000, petitioner was owned as follows: Tommie Carpenter, 75.25 percent and Virginia Carpenter, 24.75 percent. Accordingly, Tommie and Virginia Carpenter (the partners) ultimately were allocated all items of income, gain, loss, deduction, and credit of the partnership.

During its 2000 taxable year the partnership sold shares of stock of American Tower Corp. (ATC), a publicly traded corporation listed on the New York Stock Exchange, for total proceeds of $29,608,861 (the stock sale). On or before October 15, 2001, the partnership timely filed Form 1065, U.S. Return of Partnership Income, for its taxable year ending December 31, 2000. On this information return the partnership reported gross proceeds of $29,608,861, an adjusted tax

---

[1] Section references are to the Internal Revenue Code of 1986, as amended and in effect for the tax year at issue.

basis of $23,285,745, and gain of $6,323,116 from the stock sale. On or before October 15, 2001, the partners timely filed a joint income tax return on Form 1040, U.S. Individual Income Tax Return, for calendar year 2000. On this tax return the partners reported all of the $6,323,116 gain from the stock sale.

On April 10, 2007, petitioner sent to respondent a Form 872–P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, executed on behalf of the partnership. Also on April 10, 2007, the partners sent to respondent an executed Form 872–I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable to Items of a Partnership. On October 2, 2008, respondent issued an FPAA to petitioner, as tax matters partner of the partnership, for the partnership's taxable year ending December 31, 2000.

## II. *The Theory of the FPAA*

Respondent alleges that "the partnership exploited a complex series of basis-inflating tax avoidance transactions (a variant of the Son-of-BOSS shelter described in Notice 2000–44) beginning in December 1999." See Notice 2000–44, 2000–2 C.B. 255, which describes so-called Son-of-BOSS transactions. See also *Kligfeld Holdings v. Commissioner*, 128 T.C. 192, 194 (2007), discussing the prototypical Son-of-BOSS transaction:

Son-of-BOSS is a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy." There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis. If so, the result is that the partners will have a basis in the partnership so great as to provide for large—but not out-of-pocket—losses on their individual tax returns. * * *

Respondent claims a Son-of-BOSS shelter is at work on account of a transfer to the partnership "of short sale proceeds of Treasury Notes and the obligation to close the open short sale position". Respondent contends that this transfer "artificially stepped-up inside basis". According to respondent: "As a result of the artificial step-up in basis in

the American Tower Corporation stock, the partnership's total net long-term gains derived from dealings in property on its 2000 return was [significantly] understated".

III. *Motion for Summary Judgment*

Petitioner moved for summary judgment, arguing that the FPAA was not timely because it was issued after "The period of limitations imposed by I.R.C. § 6501 on assessment and collection of tax * * * [of] three years from the date the return to which the tax relates was filed." Both the partnership's information tax return and the partners' joint income tax return were filed on or before October 15, 2001. The 3-year limitations period, if applicable, would have expired on or before October 15, 2004. Petitioner contends that "Because the FPAA was issued after October 15, 2004, respondent is precluded from assessing any tax attributable to items reported on the Partnership Tax Return."

Petitioner further argues that the untimeliness of the FPAA invalidates petitioner's and the partners' consents to extend the limitations period. "Neither of the Forms 872 signed by petitioner or the Partners was executed before the expiration of the three-year period of limitations imposed by I.R.C. § 6501(a) or 6229(a)." As a result, according to petitioner, these consents cannot be used "to reopen the three-year period of limitations on assessment and collection of tax." See sec. 6501(c)(4) ("Where, *before the expiration of the time* prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon." (Emphasis supplied.)); see also *Romine v. Commissioner*, 25 T.C. 859, 871 (1956) (holding that if a taxpayer executes a consent after the expiration of the 3-year limitations period, the Commissioner bears the burden of proving that a longer limitations period applies and that the consent was obtained within such longer period); *Seltzer v. Commissioner*, 21 T.C. 398 (1953) (same).

## IV. *Timeliness of the FPAA*

Respondent claims that the applicable period of limitations is not 3 years but 6 years, as provided in sections 6229(c)(2) and 6501(e)(1)(A).

On September 24, 2009, the Treasury Department and the Internal Revenue Service issued temporary Treasury regulations under Sections 6229(c)(2) and 6501(e)(1)(A) that clarify that an overstatement of basis relating to the disposition of property, other than the sale of goods or services in a trade or business, constitutes an omission from gross income for purposes of Sections 6229(c)(2) and 6501(e)(1)(A).

Respondent argues that these temporary regulations, sections 301.6229(c)(2)–1T and 301.6501(e)–1T, Temporary Proced. & Admin. Regs., 74 Fed. Reg. 49322–49323 (Sept. 28, 2009), extend the limitations period for the partnership's 2000 taxable year to 6 years because they "apply to taxable years with respect to which the applicable period for assessing tax, as interpreted in the temporary regulations, did not expire before September 24, 2009."

Because "The FPAA * * * issued within the six-year period of limitations provided in Sections 6229(c)(2) and 6501(e)(1)(A), as further extended by consent," respondent contends that the FPAA was timely.

## *Discussion*

### I. *Introduction*

We have previously held invalid the temporary regulations respondent cites. See *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211, 224 (2010).[2] Since we issued our Opinion in *Intermountain*, the Commissioner has issued these regulations in final form. See secs. 301.6229(c)(2)–1, 301.6501(e)–1, Proced. & Admin. Regs. Also, the Supreme Court has issued its opinion in *Mayo Found. v. United States*, 562 U.S. ____, 131 S. Ct. 704 (2011), which clarifies that the Commissioner's regulatory efforts are generally entitled to the same *Chevron* standard as those of any other agency. See *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S.

---

[2] See *infra* note 15, discussing the current procedural posture of *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211 (2010), and related cases, in which the Commissioner has hitherto succeeded twice on appeal, and failed an equal number of times, as he seeks to invoke sec. 6501(e)(1)(A) and apply a 6-year limitations period to Son-of-BOSS transactions.

837 (1984) (establishing a two-step framework for testing the validity of an agency's interpretation of ambiguous statutes). We take this opportunity to consider whether anything in the final regulations or their preamble or *Mayo* warrants a revision of our *Intermountain* holding.[3]

## II. *Effective/Applicability Date Provisions: Placing the Horse Firmly in the Cart*

The preamble to these final regulations asserts that "The Tax Court's majority in *Intermountain* erroneously interpreted the applicability provisions of the temporary and proposed regulations". T.D. 9511, 2011–6 I.R.B. 455, 456. We are not infallible and have reviewed our interpretation of the regulations' applicability provisions in the light of respondent's criticism, but as discussed below we still do not agree with respondent.

The temporary regulations provided that "The rules of this section apply to taxable years with respect to which the applicable period for assessing tax *did not expire before* September 24, 2009." Secs. 301.6229(c)(2)–1T(b), 301.6501(e)–1T(b), Temporary Proced. & Admin. Regs., *supra* (emphasis supplied). In *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, *supra* at 218–219, we had commented on the "notably convoluted interpretation of the effective/applicability date provisions" required to cause the temporary regulations to apply to a case where the 3-year limitations period has already expired. We had remarked that the Commissioner's attempt to apply the temporary regulations in that case "begs the question". *Id.*

---

[3] By their terms, the final regulations purport to apply to this case. Other than minor stylistic changes in the effective/applicability provisions, which we discuss *infra* Pt. II, and largely conforming changes in the accompanying preambles, which we discuss *infra* Pt. IV, the final and temporary regulations are identical. Therefore, we have decided not to delay these proceedings for supplemental briefing on the final regulations before ruling on their (in)validity. We note that to date neither party has asked for leave to file such briefs. By comparison, the Commissioner promptly filed notices of supplemental authority calling attention to the Supreme Court's opinion in *Mayo Found. v. United States*, 562 U.S. ___, 131 S. Ct. 704 (2011), in the various *Intermountain*-related cases on appeal discussed *infra* note 15, including *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011), in which oral argument was conducted the day after *Mayo* was issued. Moreover, the Commissioner has asked these various Courts of Appeals to apply the final regulations. Consequently, respondent can reasonably be expected to cite and rely on the final regulations as relevant and applicable authority in any appeal of our decision. We thus feel we would be derelict in our duty to the court hearing such an appeal if we were to simply grant petitioner's motion for summary judgment based on the temporary regulations without discussing the final regulations.

By comparison with the effective/applicability date provisions of the temporary regulations, the final regulations provide that "This section applies to taxable years with respect to which the period for assessing tax *was open on or after* September 24, 2009." Sec. 301.6229(c)(2)–1(b), Proced. & Admin. Regs. (emphasis supplied); see also sec. 301.6501(e)–1(e), Proced. & Admin. Regs. Respondent and the Treasury Department contend that "The final regulations * * * clarify the effective/applicability date provisions in the section 6229(c)(2) and section 6501(e) regulations to eliminate a perceived ambiguity in the temporary regulations, that was brought to light by the Tax Court in *Intermountain Insurance Service of Vail v. Commissioner*, 134 T.C. No. 11 (2010), appeal docketed, No. 10–1204 (D.C. Cir.)." T.D. 9511, 2011–6 I.R.B. at 455.

We fail to see how this semantic distinction in the effective/applicability date provisions between the final regulations and the temporary regulations, the verbal equivalent of the other side of the same coin, begets a response to the begged question.

Unlike the terse text of the final regulations' effective/applicability date provisions, the accompanying preamble contends at length that

The Internal Revenue Service will continue to adhere to the position that "the applicable period" of limitations is not the "general" three-year limitations period. * * * The expiration of the three-year period does not "close" a taxable year *if a longer period applies*. * * * [T.D. 9511, 2011–6 I.R.B. at 456; emphasis supplied.]

However, whether or not a longer period should, in fact, apply is the very subject matter, the sum and substance of the regulations.[4] Clearly, then, as with the temporary regu-

---

[4] The final regulations' preamble goes on to assert that "Consistent with that position [which assumes their substantive validity], the final regulations apply to taxable years with respect to which the six-year period for assessing tax under section 6229(c)(2) or 6501(e)(1) was open on or after September 24, 2009." T.D. 9511, 2011–6 I.R.B. 455, 456. On the basis of this conclusory assertion, the Court of Appeals for the Federal Circuit held in *Grapevine Imps., Ltd. v. United States*, *supra* at 1383, that "by their plain terms the new Treasury regulations apply to" the taxpayer's tax year for which the 3-year limitations period had expired. We do not believe that the actual text of the regulations says as much. As mentioned above, pursuant to their effective/applicability date provisions, the substance of the final regulations "[applies] to taxable years with respect to which the period for assessing tax was open on or after September 24, 2009". T.D. 9511, 2011–6 I.R.B. at 455. In "an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–414 (1945);

Continued

lations, in order to apply the final regulations to a taxable year after the expiration of the "general" 3-year limitations period, one must presuppose that the regulations are otherwise valid and that they apply retroactively.[5] In other words, the applicability of the regulations assumes their substantive validity. We held this assumption untenable in *Intermountain Ins. Serv. of Vail, LLC v. Commissioner, supra* at 224. After reviewing the final regulations and their preamble and considering any effect that *Mayo* may have, we reaffirm our prior conclusion for the reasons set forth below.

### III. *Substantive Validity: Divining Congressional Intent*

As we did previously when reviewing the temporary regulations, and as we now do in testing the final regulations, we "must judge the propriety of * * * [respondent's] action solely by the grounds invoked by" him. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).[6] From the preambles to the

---

see also *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("Although the preamble does not 'control' the meaning of the regulation, it may serve as a source of evidence concerning contemporaneous agency intent."). However, whether a tax year in question is "open" is the very essence of these proceedings. Deferring to respondent's interpretation of "open" tax years for purposes of the effective/applicability date provisions would inevitably resolve the question of legitimacy of the regulations' substance. More generally, if we were to allow the Secretary to replicate in his regulations the core of the Code provision at issue and then defer to the Commissioner's interpretation of this regulatory text, it would inappropriately imbue this text with the solidity of *Seminole Rock*, instead of subjecting it to the two steps of *Chevron*. Cf. *Stinson v. United States*, 508 U.S. 36, 45 (1993) (declining to apply *Chevron* and relying on *Seminole Rock* for the proposition that "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation" (quotation marks omitted)).

[5] Respondent insists "these regulations are not retroactive". T.D. 9511, 2011–6 I.R.B. at 456. The Commissioner's previous regulatory foray in his ongoing quest to bring to justice past abusive Son-of-BOSS transactions was lost, as Eurydice was lost to Orpheus, when the Commissioner chose to turn around and look directly backwards by giving his regulations full-blown retroactive effect. See generally *Murfam Farms, LLC v. United States*, 88 Fed. Cl. 516 (2009) (holding as impermissibly retroactive sec. 1.752–6, Income Tax Regs., which requires reduction in a partner's outside basis in the partnership upon the partnership's assuming the partner's contingent liability, and discussing other similar holdings).

Perhaps mindful of that experience, respondent now argues that he is no longer looking back. Instead, he claims that he is, in effect, glancing sideways, and appears to wield the circular logic of the effective/applicability date provisions as the round and polished shield of Perseus in which he can safely view the Gorgon's reflection.

Sec. 7805(b) and its caption of "Retroactivity of Regulations" notwithstanding, in the conventional linear temporal mode, changes in legal rules have only prospective impact. "At least until we devise time machines, a change can have its effects only in the future." *Bergerco Can. v. U.S. Treasury Dept.*, 129 F.3d 189, 192 (D.C. Cir. 1997). Putting such abstruse arguments to one side, these regulations, if valid, would cause a limitations period that would have otherwise expired as of September 23, 2009, to remain open beyond that date. They thus "relate back" and in that respect are "retroactive" in the mundane sense of the word.

[6] *Chenery* sweeps wider than the Administrative Procedure Act's "basis and purpose" requirement, 5 U.S.C. sec. 553(c) (2006). Requiring an agency to give reasons for its rulemaking will

temporary and final regulations, we isolate two discrete grounds that respondent can possibly adduce as bases upon which his regulatory project "purports to rest", *id.*: (1) The Supreme Court's holding in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), which excluded overstatement of basis from the phrase "omits from gross income" in the identically worded predecessor of current section 6501(e)(1)(A), was confined by section 6501(e)(1)(A)(i) to a trade or business context;[7] and (2) *Colony* represents the Supreme Court's own construction of this phrase as it now appears in section 6501(e)(1)(A), rather than an explication of unambiguous congressional intent.

These two grounds are mutually exclusive. If the *Colony* holding has been statutorily confined to a trade or business context, it cannot any longer constitute the Supreme Court's interpretation of current section 6501(e)(1)(A). Conversely, if *Colony* represents the Supreme Court's own construction of this text, the holding must necessarily extend beyond just trade or business.

Respondent leads with the former contention, which he vociferously espouses, not just in the preambles to the temporary and final regulations, but also in his submissions on brief in this and other similar cases.[8] The latter claim, on the other hand, is presented with great circumspection. After being absent in the preamble to the temporary regulations, this claim appears stealthily in the final regulations' pre-

---

not itself ensure that review of the rule will be limited to those reasons. Legislation or trial court decisions can both be subsequently sustained on other grounds. See, e.g., *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision" (internal quotation marks omitted)); *Helvering v. Gowran*, 302 U.S. 238, 245 (1937) ("In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason."). However, agency action can be upheld only on the ground previously advanced by the agency. See, e.g., *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (holding that under *Chenery* "For the courts to substitute their or counsel's discretion for that of the * * * [agency] is incompatible with the orderly functioning of the process of judicial review.").

[7] This provision, without changes in text, has since been redesignated sec. 6501(e)(1)(B)(i) by the Hiring Incentives to Restore Employment Act of 2010, Pub. L. 111–147, sec. 513(a)(1), 124 Stat. 111. The provision states that "In the case of a trade or business, the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services". Since bases of goods or services sold by a trade or business do not affect its gross income, an overstatement of any such basis will not constitute omission from gross income.

[8] See *infra* note 10.

amble, and even there is shrouded in caveats and qualifications. [9]

### A. *Trade or Business With Colony*

The final regulations' preamble reiterates respondent's position, "set forth in the preamble to the temporary regulations", that "the Supreme Court's opinion in *Colony v. Commissioner*, 357 U.S. 28 (1958), * * * [is limited to] an omission from gross income in the context of a trade or business under the predecessor of section 6501(e)." T.D. 9511, 2011–6 I.R.B. at 455; see also T.D. 9466, 2009–43 I.R.B. 551, 552 ("Therefore, by amending the Internal Revenue Code, including the addition of a special definition of 'gross income' with respect to a trade or business, Congress effectively limited what ultimately became the holding in *Colony*, to cases subject to section 275(c) of the 1939 Internal Revenue Code."). This echoes similar arguments that the Commissioner has made on brief in related litigation across the country. [10]

This case would, absent stipulation to the contrary, be appealable to the U.S. Court of Appeals for the Ninth Circuit. That court has rejected the argument that the *Colony* holding is properly construed as limited to the sale of goods and services in a trade or business. "There is no ground for suggesting that the Court intended the same language in § 275(c) to apply differently to taxpayers in a trade or business than to other taxpayers." *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767, 778 (9th Cir. 2009), affg. 128 T.C. 207 (2007).

---

[9] See *infra* Pt. IV.

[10] See, e.g., *Burks v. United States*, 633 F.3d 347, 350 (5th Cir. 2011) ("The government contends that *Colony* applies only in the context of a trade or business engaged in the sale of goods or services."); *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249, 254 (4th Cir. 2011) ("In this case, the district court distinguished *Colony* on the ground that its holding is limited to cases in which the taxpayer is a trade or business selling goods or services."); *Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1371 (Fed. Cir. 2009) ("In the government's view, * * * *Colony*'s holding [is properly construed] narrowly by defining 'gross income' as gross receipts of a trade or business from sales of goods or services"); *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767, 775 (9th Cir. 2009) ("the IRS argues that *Colony*, read correctly, interpreted § 275(c) as having the same meaning as § 6501(e)(1)(A)(i) and applying only to taxpayers in a trade or business"), affg. 128 T.C. 207 (2007); accord *Beard v. Commissioner*, 633 F.3d 616, 620 (7th Cir. 2011) (accepting the Commissioner's argument and finding that "the situation faced by the Court in *Colony* [is one] where there is an omission of an actual receipt or accrual in a trade or business situation"), revg. T.C. Memo. 2009–184.

In *Bakersfield*, the Court of Appeals for the Ninth Circuit held that the current section 6501(e)(1)(A), which was enacted as part of the Internal Revenue Code of 1954, did not constitute a "new statutory setting" for the phrase "omits from gross income".

Congress did not change the language in the body of § 6501(e)(1)(A), which is identical to the language in § 275(c) that the Supreme Court construed in *Colony*. As a general rule, we construe words in a new statute that are identical to words in a prior statute as having the same meaning. * * * [*Id.* at 775.]

Finding "that applying *Colony* to the 1954 Code would [not] render * * * superfluous" any provision of section 6501(e)(1)(A), *id.* at 776, the court went on to conclude that the *Colony*

holding controls our interpretation of the same language in § 275(c)'s successor provision, § 6501(e)(1)(A) of the 1954 Code. However sensible the IRS's argument may be that a taxpayer can "omit . . . an amount" of gain by overstating its basis, this argument is foreclosed by *Colony*. * * * [*Id.* at 778.]

The Court of Appeals for the Ninth Circuit's opinion in *Bakersfield* was quickly followed by an opinion of the Court of Appeals for the Federal Circuit that also failed to "discern any basis for limiting *Colony*'s holding concerning the 'omits from gross income' language of I.R.C. § 275(c) to sales of goods or services by a trade or business." *Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1372 (Fed. Cir. 2009). [11]

These two Courts of Appeals have now been joined by the Courts of Appeals for the Fourth and Fifth Circuits, which have similarly declined to limit the *Colony* holding to a trade

---

[11] The Court of Appeals for the Federal Circuit has since decided to accord the regulations at issue here *Chevron* deference. See *Grapevine Imps., Ltd. v. United States*, 636 F.3d at 1376. The court distinguished this decision from its holding in *Salman Ranch* that *Colony* was not limited to a trade or business context, declaring that

*Salman Ranch* [does not] mandate any different conclusion. This court there closely analyzed both the updated statute and its legislative history to determine whether divergence from *Colony* was warranted. It made no separate holding that the statute was unambiguous for purposes of *Chevron* step one * * *. [*Id.* at 1378; citation omitted.]

*Grapevine* does not reject the court's prior reading of *Colony* in *Salman Ranch*. Since "*Salman Ranch* preceded the issuance of Treasury regulations interpreting this statute", *Grapevine* characterized the court's task in *Salman Ranch* "different from ours." *Id.* at 1377. Finding *Colony* "no bar" to granting the regulations *Chevron* deference, *Grapevine* concludes that "*Salman Ranch* notwithstanding, we will defer to the Treasury Department's interpretation in applying § 6501(e)(1)(A)." *Id.* at 1381. As we explain *infra* note 28, we have concluded to the contrary that *Colony* is a "bar" to *Chevron* deference.

or business. See *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249, 255 (4th Cir. 2011)) ("Like the Ninth and Federal Circuits, we hold that the Supreme Court in *Colony* straightforwardly construed the phrase 'omits from gross income,' unhinged from any dependency on the taxpayer's identity as a trade or business selling goods or services."); *Burks v. United States*, 633 F.3d 347, 355 (5th Cir. 2011) ("We join the Fourth, Ninth, and Federal Circuits by finding that *Colony*'s holding with respect to the definition of 'omits from gross income' [is not limited to trade or business and] remains applicable in light of the revisions to the Code.").

The Court of Appeals for the Seventh Circuit, on the other hand, has sided with the Commissioner and limited the applicability of *Colony* to an omission from income of a trade or business. See *Beard v. Commissioner*, 633 F.3d 616, 620 (7th Cir. 2011) (concluding that "*Colony*'s holding is inherently qualified by the facts of the case * * *, where the * * * omission was * * * in the course of trade or business."), revg. T.C. Memo. 2009–184.

Following the Commissioner's judicial setbacks in *Bakersfield* and *Salman Ranch*, the Secretary issued the temporary regulations, seeking, as it were, to lay a regulatory foundation for respondent's position that an overstatement of basis does constitute an omission from gross income under section 6501(e)(1)(A). Respondent claims that this regulatory project "is entitled to deference even if the agency's interpretation may run contrary to the opinions in *Bakersfield* and *Salman Ranch*." See T.D. 9466, 2009–43 I.R.B. at 552. However, neither of those opinions was based on the court's interpretation of section 6501(e)(1)(A). Instead, each court had held *Colony* to control this interpretation, which it, in turn, merely followed. In effect, then, respondent is asking us to defer to his determination of whether that Supreme Court decision is on point.

Amidst conflicting signals of legislative intent, *Chevron* and its progeny certainly require deference to the administering agency's interpretation of the resulting statutory language. However, we know of no authority, and respondent cites none, that requires us to defer to the Commissioner's determination of the applicability of Supreme Court precedent.

When Congress speaks in muffled tones, the Commissioner presumably enjoys an advantage in deciphering the message. And though we are respectful of the Commissioner's experience in reviewing court opinions, we decline to surrender our prerogative of interpreting judicial pronouncements—ambiguous or otherwise.

Respondent does not purport, at least not explicitly and unequivocally,[12] to elevate his interpretation of the text in current section 6501(e)(1)(A) above that of the Court in *Colony*. Rather, he seeks to persuade us, as he has succeeded in persuading the Court of Appeals for the Seventh Circuit in *Beard*,[13] that the *Colony* holding is not relevant to our inquiry. Respondent may arguably have the authority to attempt to reach the former outcome, at least in the Tenth Circuit.[14] But we, the U.S. Court of Federal Claims, and the U.S. District Courts, subject to review by the respective Courts of Appeals and the Supreme Court, retain ultimate authority over the latter, in all circuits.[15]

---

[12] Cf. *infra* Discussion, Pt. IV, discussing respondent's "vague and indecisive" attempt to supplant the *Colony* holding with a contrary interpretation of the statutory text in current sec. 6501(e)(1)(A).

[13] See *Beard v. Commissioner*, 633 F.3d at 623. *Beard* lists a number of cases that "have found that *Colony* does not apply and an overstatement of basis can be an omission from gross income." *Id.* at 619–620. Included in this list is *Phinney v. Chambers*, 392 F.2d 680 (5th Cir. 1968), a case that was decided decades before the Son-of-BOSS transaction could have constituted the proverbial gleam in its promoters' eyes. As we pointed out in *UTAM, Ltd. v. Commissioner*, T.C. Memo. 2009–253, we believe that "*Phinney* is not directly on point and does not persuade this Court to overrule *Bakersfield*." *Phinney* did not involve applying an extended period of limitations to a transaction in which the taxpayer had overstated basis. Instead, in *Phinney*,

The Fifth Circuit Court of Appeals * * * found that the 6-year period of limitations applied to a fiduciary income tax return on which the nature of an item of income was misstated. The Commissioner was at a disadvantage identifying the error in the reporting of the transaction in issue in *Phinney* because the fiduciary tax return listed the item of income without disclosing its receipt in an installment sale. * * * [*UTAM, Ltd. v. Commissioner*, *supra*.]

The Court of Appeals for the Fifth Circuit in *Burks* appears to validate our reading of *Phinney* and faults *Beard*'s interpretation of the case. See *Burks v. United States*, 633 F.3d at 352 n.5 ("The Seventh Circuit in *Beard* incorrectly read our decision in *Phinney* as limiting *Colony*'s holding."). The taxpayers in *Beard* have since filed a motion for a rehearing en banc based on, amongst other grounds, the claim that *Beard* "relied heavily on the Commissioner's interpretation of *Phinney*, purportedly 'distinguishing *Colony* as the *Phinney* court did.' This reliance was misplaced. The Fifth Circuit [in *Burks*] stated that 'they do not read *Phinney* as limiting *Colony*'s holding.'" See also *infra* note 16, discussing why the Court of Appeals for the Ninth Circuit's decision in *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767 (9th Cir. 2009), affords us the luxury of staying on the firm and dry ground of concluding that *Colony* controls the interpretation of sec. 6501(e)(1)(A).

[14] The Court of Appeals for the Tenth Circuit in *Hernandez-Carrera v. Carlson*, 547 F.3d 1237 (10th Cir. 2008), applied *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. 967 (2005), to uphold regulations reversing a Supreme Court decision.

[15] The Commissioner has appealed to the appropriate Courts of Appeals *Intermountain Ins.*

Continued

Following *Bakersfield*, we conclude that *Colony* is not limited to a trade or business, and that it controls our interpretation of section 6501(e)(1)(A). [16]

Such a conclusion, by itself, does not rule out *Chevron* deference to the regulations. [17] It does mean, however, that instead of applying the original version of the *Chevron* analysis, we apply its *Brand X* variant. [18] Compare *Chevron*

---

*Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211 (2010), and several companion cases in which he had sought to invoke sec. 6501(e)(1)(A) and apply a 6-year limitations period to Son-of-BOSS transactions. The Commissioner thus far has been successful in *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011), and *Beard v. Commissioner*, 633 F.3d 616 (7th Cir. 2011), discussed *supra* notes 11 and 13, respectively, and unsuccessful in *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249 (4th Cir. 2011), and *Burks v. United States*, 633 F.3d 347 (5th Cir. 2011), discussed *infra* note 27. The Commissioner's petition for rehearing en banc was denied in *Home Concrete* and is pending in *Burks*. The Commissioner is urging the respective Courts of Appeals in *Burks* and other cases still on appeal to apply the final regulations in reaching their decisions. See, e.g., *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, *supra*, on appeal (D.C. Cir., July 27, 2010); *UTAM, Ltd. v. Commissioner*, T.C. Memo. 2009–253, on appeal (D.C. Cir., Aug. 17, 2010); *Reynolds Props., L.P. v. Commissioner*, docket No. 22437–07 (order and decision entered May 11, 2010), on appeal (9th Cir., Aug. 3, 2010); *Salman Ranch, Ltd. v. Commissioner*, docket No. 13677–08 (order and decision entered Aug. 7, 2009), on appeal (10th Cir., Oct. 27, 2009).

[16] As pointed out *supra* note 13 and the accompanying text, the Court of Appeals for the Seventh Circuit has recently rejected the conclusion reached in *Bakersfield* and *Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009), that *Colony* controls the interpretation of sec. 6501(e)(1)(A). *Beard v. Commissioner*, *supra*. *Beard* described the *Bakersfield* reasoning as wading "through a convoluted discussion of numerators and denominators". *Id.* at 623. *Beard* also dismissed the Federal Circuit's *Salman Ranch* holding, characterizing it as "a deep-dive into legislative history". *Id.* Preferring to toe "the clear, dry line from the language to the plain meaning of Section 6501(e)(1)(A)", the Court of Appeals for the Seventh Circuit finds "that *Colony* is not controlling". *Id.* Since this case would, absent stipulation to the contrary, be appealable to the Court of Appeals for the Ninth Circuit, we are content to follow *Bakersfield*, which holds that *Colony* controls the interpretation of sec. 6501(e)(1)(A). Cf. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970) (requiring us to follow *Beard* and hold that *Colony* does not control the interpretation of sec. 6501(e)(1)(A) in a case appealable to the Court of Appeals for the Seventh Circuit), affd. 445 F.2d 985 (10th Cir. 1971).

[17] See *Grapevine Imps., Ltd. v. United States*, *supra* at 1376 (discussed *supra* note 11, holding that in the absence of the regulations, *Colony* controls the interpretation of sec. 6501(e)(1)(A), but since "*Chevron* review of the new Treasury regulations * * * [compels that] the Treasury regulations are entitled to *Chevron* deference * * * [, they constitute] new intervening authority * * * [that] require us to depart from * * * [*Colony*]"); cf. *Beard v. Commissioner*, *supra* at 623 (highlighting the volume of ink that "has been spilled in the briefs over whether temporary Treasury Regulation Section 301.6501(e)–1T(a)(1)(iii) would be entitled to *Chevron* deference if *Colony* were found to be controlling", the court declined to reach that issue "Because we find that *Colony* is not controlling").

[18] We note, without judging, the Commissioner's asserted ability to command *Chevron* deference to, and establish *Brand X* primacy for, regulations that rearrange the tax outcome of a transaction well after that transaction's economic consequences have been realized. See *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 982 ("*Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps."). This ace-in-the-hole can trump the best laid plans of honest and cynical taxpayers and deter both from asserting their "Code-given" rights. For an example of how after-the-fact changes in tax law can render Pyrrhic hard-fought, time-consuming, and expensive litigation victories, see Hellerstein, "Is 'Internal Consistency' Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation", 87 Mich. L. Rev. 138, 144–145 n.33 (1988) (discussing the eventual futility of an initially successful Commerce Clause challenge in *Tyler Pipe Indus., Inc. v. Wash. Dept. of Revenue*, 483 U.S. 232 (1987),

*U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. at 843 (upholding an agency's reasonable interpretation of a statute only if "Congress has not directly addressed the precise question at issue"), with *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 984 (allowing "a court's prior interpretation of a statute to override an agency's [contrary] interpretation only if the relevant court decision held the statute unambiguous").

## B. *Colony's Chevron Classification*

In *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. at 224 (internal quotation marks omitted), we held that *Colony* "forecloses the agency's interpretation of sections 6229(c)(2) and 6501(e)(1)(A) and displaces respondent's temporary regulations." Nothing in the final regulations or their preamble, or *Mayo*, gives us cause to revise that conclusion.

### 1. *Invitation to Regulation*

The Court of Appeals for the Ninth Circuit in *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d at 778, conceded that in its *Colony* opinion, the Supreme Court had "acknowledged that the statutory language was ambiguous, but nonetheless rejected the same interpretation the IRS is proposing in this case." (Citations omitted.) Respondent claims that this concession by the Court of Appeals constitutes an invitation to issue regulations to reverse the *Bakersfield* outcome. See T.D. 9466, 2009–43 I.R.B. at 552. The Court of Appeals had indeed stated that "The IRS may have the authority to promulgate a reasonable reinterpretation of an ambiguous provision of the tax code, even if its interpretation runs contrary to the Supreme Court's 'opinion as to the best reading' of the provision." *Bakersfield Energy Partners, LP v. Commissioner*, *supra* at 778 (quoting *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 983).

However, "The Court of Appeals did not indicate definitively whether any such * * * regulations would actually trump the Supreme Court's prior judicial construction." *Inter-*

to the State of Washington's discriminatory business and occupations tax). For further discussion of a "meaningful post-deprivation remedy" in this context, see *Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996); *Reich v. Collins*, 513 U.S. 106 (1994); *Harper v. Va. Dept. of Taxation*, 509 U.S. 86 (1993); *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18 (1990).

*mountain Ins. Serv. of Vail, LLC v. Commissioner*, *supra* at 224 n.24. Assuming regulations that are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", and are issued in "observance of procedure required by law", 5 U.S.C. sec. 706(2)(A), (D) (2006), assumptions not necessarily satisfied here, there remain two unresolved issues that would potentially affect the analysis: (1) Whether legislative history should be considered at step one of the two-step *Chevron* analysis; and (2) whether a construction of statutory language by the Supreme Court automatically renders the statute unambiguous.

With respect to the applicability of legislative history at *Chevron* step one, compare *Natural Res. Def. Council v. U.S. EPA*, 526 F.3d 591, 603 (9th Cir. 2008) ("An examination of the statutory language and its legislative history assists us in this [*Chevron* step one] inquiry."), with *Schneider v. Chertoff*, 450 F.3d 944, 955 n.15 (9th Cir. 2006) ("Although we cannot consider legislative history under the first prong of *Chevron*, * * * we note that the Secretary's regulation subverts the very intent of the Nursing Relief Act."). [19]

Regarding whether an agency's interpretation can trump a prior Supreme Court construction of the same statutory language, compare *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. at 1003 (Stevens, J., concurring) ("I add this caveat concerning * * * [that part of

---

[19] On the inadvisability of a blanket prohibition against consulting legislative history, see *Harrison v. N. Trust Co.*, 317 U.S. 476, 479 (1943) ("But words are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination." (Internal quotation marks omitted.)). If words are inherently ambiguous, then judicial interpretation of an agency-administered statute that eschews legislative history and grants the agency's interpretation *Chevron* deference would apparently cede to the agency power reserved for the legislative branch. *Chevron* deference would thus seem to violate the same structural constraint that textualists fault the use of legislative history for transgressing; i.e., implicit constitutional prohibitions against legislative self-delegation, such as the bicameralism and presentment requirements. For an exposition of the nondelegation argument in favor of textualism, see *Bank One Chi., N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 280 (1996) (Scalia, J., concurring in part and in the judgment) ("It has always been assumed that * * * [congressional legislative] powers are nondelegable * * * No one would think that the House of Representatives could operate in such fashion that only the broad outlines of bills would be adopted by vote of the full House, leaving minor details to be written, adopted, and voted upon only by the cognizant committees."). By comparison, *Chevron* deference would enable "minor details" to be written and adopted by the agency, without allowing for any congressional vote, not even that of "a small band of its number". *Id.* A defense of legislative history against a nondelegation charge may be found in Breyer, "On the Uses of Legislative History in Interpreting Statutes", 65 S. Cal. L. Rev. 845, 863 (1992) ("No one claims that legislative history is a statute, or even that, in any strong sense, it is 'law.' Rather, legislative history is helpful in trying to understand the meaning of the words that do make up the statute or the 'law.'").

the Court's opinion], which correctly explains why a court of appeals' interpretation of an ambiguous provision in a regulatory statute does not foreclose a contrary reading by the agency. That explanation would not necessarily be applicable to a decision by this Court that would presumably remove any pre-existing ambiguity."), with *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1248 (10th Cir. 2008) ("we conclude that the holding of *Brand X* applies whether the judicial precedent at issue is that of a lower court or the Supreme Court.").

### 2. *The Mayo Effect*

We pause here to observe that the Supreme Court recently rejected a taxpayer challenge to section 31.3121(b)(10)–2, Employment Tax Regs., promulgated by the Treasury Department to define the word "student" in section 3121(b)(10). *Mayo Found. v. United States*, 562 U.S. ____, 131 S. Ct. 704 (2011). In doing so, the Supreme Court clarified that the *Chevron* standard of deference applies to Treasury regulations. The Court pointed out that the taxpayer in *Mayo* had "not advanced any justification for applying a less deferential standard of review to Treasury Department regulations than we apply to the rules of any other agency." *Id.* at ____, 131 S. Ct. at 713. The Court held that "In the absence of such justification, we are not inclined to carve out an approach to administrative review good for tax law only." *Id.*

The Supreme Court's opinion in *Mayo* implies, by omission rather than affirmative statement, that a trial court's investigation of congressional intent at *Chevron* step one be limited to the plain text of the statute. See *id.* at ____, 131 S. Ct. at 711 ("In any event, *the statutory text* still would offer no insight into how *Congress intended* predominance to be determined or whether Congress thought that medical residents would satisfy the requirement. * * * In the typical case, such an ambiguity would lead us *inexorably* to *Chevron* step two" (emphasis supplied)).

Though *Mayo* tangentially addresses the first issue and appears to frown upon the use of legislative history at step one of a *Chevron* analysis, it is silent on the second issue of whether the Supreme Court's *Brand X* holding applies to its

own precedent. *Mayo*'s silence on this score is not surprising since the Supreme Court had no occasion to interpret the word "student" in section 3121(b)(10) before the Treasury Department's issuing of the challenged regulation.

By comparison, the Supreme Court's *Colony* holding predates the regulations at issue here by over half a century. Fortunately, and as we explain *infra* Part IV, respondent's indecision has spared us the ordeal of walking the plank and plumbing the depths of *Brand X*.[20]

### 3. *Filling the Gap*

Gaps in congressional enunciation, whether intentional or inadvertent, can be filled by the Commissioner to dictate the underlying meaning. So long as the Commissioner is reasonable, *Chevron* implies, and *Mayo* confirms, that we permit him to complete Congress' sentences, unless he contradicts the "unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. at 843.

Where a court whose precedent is binding on us has previously interpreted the statutory language at issue, "if the prior court decision holds that its construction follows from the unambiguous terms of the statute", *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 982, then "that is the end of the matter", *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, *supra* at 842. We, in turn, merely follow the precedent, which automatically "displaces a conflicting agency construction." *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 983. For any court opinion of pre-*Chevron* vintage, we must confront and overcome the *Chevron* classification challenge on our own, without deference to annotations or commentary that the Commissioner may provide.[21]

---

[20] As we explain *infra* Pt. IV, we do not have to engage in an analysis of predicting whether the impact of the *Brand X* holding stops at the doors of the Supreme Court since respondent's "vague and indecisive" appeal to *Brand X* fails to meet the "clear and understandable basis" test of *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

[21] Making this determination with respect to court opinions that were handed down well before the Supreme Court had announced and developed the *Chevron* framework poses a unique challenge. Specifically, "it is sometimes difficult to determine whether pre-*Chevron* decisions are based upon '*Chevron* step one' (the plain command of the statute) or upon '*Chevron* step two' (a permissible construction of the statute)." *Home Concrete & Supply, LLC v. United States*, 634 F.3d at 258 (Wilkinson, J., concurring). In *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. at 224 n.22, we noted "that *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), predated both *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, *supra*, and *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra*, so that the Supreme Court could not

After maintaining silence on *Colony*'s proper *Chevron* classification in the preamble to the temporary regulations, respondent apparently attempts to categorize *Colony* as a *Chevron* step two decision in the final regulations' preamble. Respondent contends that "The Supreme Court stated in Colony that the statutory phrase 'omits from gross income' is ambiguous, meaning that it is susceptible to more than one reasonable interpretation." T.D. 9511, 2011–6 I.R.B. at 455. In *Intermountain*, we rejected this contention and firmly placed *Colony* in the *Chevron* step one category.

Since then, the Supreme Court has issued its *Mayo* opinion, which focuses exclusively on the statutory text at *Chevron* step one and suggests (by negative implication) a disfavor of using legislative history at that stage. We are not persuaded, however, that after *Mayo*, any judicial construction that examines legislative history is automatically relegated to a *Chevron* step two holding by that fact alone.

*Mayo*'s directive to move "inexorably" from an ambiguity to *Chevron* step two is reserved for the "typical case". More importantly, the ambiguity *Mayo* talks about is not any textual ambiguity per se, but an ambiguity in congressional intent that remains after searching the "statutory text * * * [for] insight into how Congress intended" the language at issue to apply. *Mayo Found. v. United States*, 562 U.S. at ____, 131 S. Ct. at 711. [22]

have been aware of the standards against which its opinion would be tested." Judge Wilkinson's concurrence in *Home Concrete & Supply, LLC v. United States*, *supra* at 258, phrased it much more elegantly in pointing out that "Justice Harlan in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), had no occasion to ponder the permutations of the *Chevron* test, which came down in 1984." In this connection, we are struck by the prophetic nature of Justice Scalia's warning regarding the "chaotic undermining of all prior judicial decisions that do not explicitly renounce ambiguity", which he delivered when he asked rhetorically: "And what of the many cases decided in the past, before this * * * requirement was established?" *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. at 1018 & n.13 (Scalia, J., dissenting).

[22] *Chevron*, the ultimate source of the eponymous doctrine, does not confine to the statutory text a search for "the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). In fact, in *Chevron*, the Supreme Court appeared to place on an equal footing both statutory text and legislative history as "traditional tools of statutory construction". *Id.* at 843 n.9; see, e.g., *id.* at 845 (quoting with approval *United States v. Shimer*, 367 U.S. 374, 382–383 (1961) (if an agency "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute *or* its legislative history that the accommodation is not one that Congress would have sanctioned" (emphasis supplied))). In discussing the regulations at issue in *Chevron*, the opinion gives as much importance, and devotes almost an equal amount of space, to legislative history as statutory language. The section titled "Legislative History" spans 2½ pages compared with the 3 pages of the section titled "Statutory Language". It would seem, then, that any apparent reluctance to resort to legislative history

Continued

*Brand X* requires only that the prior judicial construction "follows from the unambiguous terms of the statute". *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. at 982.[23] It is entirely possible for a court's opinion to discover, acknowledge and comment upon textual ambiguities in the statute and yet rest its construction on the remaining "unambiguous terms of the statute". Having done so, the court may very well analyze legislative history for additional evidence of congressional intent supporting its construction.[24]

Whatever *Mayo* may or may not prescribe (or proscribe) with respect to legislative history at *Chevron* step one, surely that prescription (and proscription) comes too late for the "many hundreds of past statutory decisions", *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 1018 (Scalia, J., dissenting), that have in fact looked at legislative history, including *Colony*.[25]

*Chevron* restrains "Judges, [who] are not experts in the field, and are not part of either political branch of the Government * * * [from reconciling] competing political interests * * * on the basis of * * * [their] personal policy preferences." *Chevron U.S.A. Inc. v. Natural Res. Def.*

represents current jurisprudential thinking on the use of legislative history in statutory construction generally. It should not be seen as an inherent limitation built into the *Chevron* two-step framework. See *infra* note 26 and accompanying text, discussing the anachronism of applying present-day sentiments on acceptable tools of statutory construction to prior Supreme Court decisions.

[23] *Brand X* leaves unspecified the term "unambiguous terms of the statute". At least as far as tax law is concerned, determining the true meaning of many statutory terms, and ascertaining whether or not they are ambiguous, entails consulting legislative history. See, e.g., Livingston, "Congress, the Courts, and the Code: Legislative History and the Interpretation of Tax Statutes", 69 Tex. L. Rev. 819, 832 (1991) ("The tax legislative process differs in several important respects from the model assumed in most interpretive theories. These differences include * * * the reliance on an extraordinary volume of legislative history (committee reports, floor colloquies, and so on) to explain and supplement the statutory language.").

[24] In *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011), a case decided after *Mayo*, the Court of Appeals for the Federal Circuit did not deem complete step one of a *Chevron* inquiry without considering legislative history. See *id.* at 1379 ("Having concluded that the text, standing alone, does not resolve Congress's intended treatment of basis overstatement, we next *must* look to see if there are any other indications of Congressional intent so clear that we perceive no room for an agency to add anything." (Emphasis supplied.)).

[25] *Brand X*'s premise may very well be that "Article III courts * * * sit to render decisions that can be reversed or ignored by executive officers." *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 1017 (Scalia, J., dissenting). We do not, however, presume that *Brand X* bestows upon us, a statutory court, the power to sit in judgment on decisions rendered by the highest constitutional court in "statutory-construction cases involving agency-administered statutes" and designate these decisions "agency-reversible", solely on the basis of an absence of dicta disclaiming the centrality of legislative history to the Court's conclusions. *Id.* at 1018–1019.

*Council*, 467 U.S. at 865. On the other hand, *Brand X*'s concern is "'the ossification of large portions of our statutory law,' * * * [which would be caused] by precluding agencies from revising unwise judicial constructions of ambiguous statutes." *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 983 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 247 (2001) (Scalia, J., dissenting)).

*Brand X*'s principle for deciding whether or not "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference * * * follows from *Chevron* itself." *Id.* at 982. Thus, *Brand X* does not introduce any substantive constraints on judicial statutory construction independent of, and in addition to, *Chevron*'s warning to "federal judges—who have no constituency—* * * to respect legitimate policy choices made by those who do." 467 U.S. at 866. It stands to reason, therefore, that only if an "unwise judicial construction" represents a policy choice, must it yield to "the wisdom of the agency's policy". *Id.*

For "deossification" of judiciary's historical "un-wisdom" to proceed, what would matter, then, are not the tools a court had employed in constructing the statute,[26] but the considerations it weighed during that process. Agencies should, thus, be free to revisit and reject a past judicial statutory construction but only if the construction arose from "assessing the wisdom of * * * policy choices and resolving the struggle between competing views of the public interest". *Id.*

---

[26] *Brand X* would, in fact, "hold judicial interpretations contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate", *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. at 982. Under that standard, "If a court, employing *traditional* tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, *supra* at 843 n.9 (emphasis supplied). Traditions, even with respect to tools of statutory construction, evolve over time. Applying current, rather than then-prevalent mores, to define traditionality in tools of statutory construction for categorizing that construction's *Chevron* status would seem anachronistic. More troubling, it could leave this *Chevron* categorization in flux, sliding up and down a two-step staircase, as the bag of permissible tools shrinks and expands. We, therefore, are reluctant to characterize legislative history, whose use may have fallen out of favor more recently, as nontraditional and, therefore, beyond the pale, for purposes of determining the *Chevron* classification of *Colony*, a case decided in 1958, when the Supreme Court readily resorted to legislative history in interpreting agency-administered statutes. See, e.g., Farber, "The Inevitability of Practical Reason: Statutes, Formalism, and the Rule of Law", 45 Vand. L. Rev. 533, 536 (1992); Molot, "Reexamining *Marbury* in the Administrative State: A Structural and Institutional Defense of Judicial Power Over Statutory Interpretation", 96 Nw. U. L. Rev. 1239, 1297 (2002).

The Supreme Court in *Colony* did allude to a policy concern when it mentioned that a contrary result would "create a patent incongruity in the tax law." *Colony, Inc. v. Commissioner*, 357 U.S. at 36–37. However, this statement was offered merely to buttress the Court's central conclusion that "We think that in enacting § 275(c) Congress manifested *no broader purpose*" than the one the Court was attributing to it and that to attribute a different purpose "would be to read § 275(c) more broadly than is justified by the *evident reason for its enactment*". *Id.* at 36 (emphasis supplied). We find these statements sufficient to conclude that *Colony* reveals unambiguous congressional intent rather than a policy choice the Court was making in the absence of agency guidance. Consequently, as we did in *Intermountain*, even after *Mayo*, we classify *Colony* as a *Chevron* step one holding. [27]

We do not consider the Court of Appeals for the Ninth Circuit's observation that the Supreme Court in *Colony* had "acknowledged that the statutory language was ambiguous," *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d at 778, fatal to *Colony*'s *Chevron* step one status in that circuit. Even if we were to assume that the Court of Appeals for the Ninth Circuit would treat *Colony* as a *Chevron* step two holding, [28] respondent's regulatory appeal to *Brand X* to

---

[27] We find validation for this classification in the recent opinions in *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249 (4th Cir. 2011), and *Burks v. United States*, 633 F.3d 347 (5th Cir. 2011), decided by the Courts of Appeals for the Fourth and Fifth Circuits, respectively, after *Mayo*. Each discusses the *Mayo* opinion and neither finds anything in it that would require a downgrade in *Colony*'s *Chevron* standing. See, e.g., *Burks v. United States*, *supra* at 360 ("Because we hold that § 6501(e)(1)(A) is unambiguous and its meaning is controlled by the Supreme Court's decision in *Colony*, we need not determine the level of deference owed to the Regulations."); *id.* n.9 ("Although we hold that § 6501(e)(1)(A) is unambiguous and its meaning is controlled by the Supreme Court's decision in *Colony*, we note that even if the statute was ambiguous and *Colony* was inapplicable, it is unclear whether the Regulations would be entitled to *Chevron* deference under *Mayo*".); *Home Concrete & Supply, LLC v. United States*, *supra* at 257 (citing *Mayo* for the proposition that "*Chevron* deference is warranted only when a treasury regulation interprets an ambiguous statute" and concluding that "Because the regulation here interprets 'omits from gross income' under § 6501(e)(1)(A), and the Supreme Court declared that statute unambiguous, we do not believe that the regulation is entitled to controlling deference."); *id.* at 257 (Wilkinson, J., concurring) ("I am persuaded that the Supreme Court rested its judgment in *Colony* on the plain language of the statute * * * [and] believe that *Colony* was decided under *Chevron* step one * * * [even though] there is some language in *Colony* suggesting that the Court looked at legislative history or thought that § 275(c) was ambiguous.").

[28] As discussed *supra* notes 11 and 17, the Court of Appeals for the Federal Circuit has in *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011), characterized *Colony* as a *Chevron* step two holding, which permits contrary regulations entitled to deference. The Court of Appeals for the Seventh Circuit in *Beard v. Commissioner*, 633 F.3d at 623, also indicated in dicta that it "would have been inclined to grant the * * * regulation *Chevron* deference," though it did not in fact reach that issue since it found *Colony* not to control the interpretation of sec. 6501(e)(1)(A), a conclusion foreclosed here by *Bakersfield Energy Partners, LP v. Commis-*

supplant the *Colony* holding fails to meet the *Chenery* test. See *SEC v. Chenery Corp.*, 332 U.S. at 196–197 (holding, with respect to "the basis upon which * * * [administrative action] purports to rest," that "a court [cannot] be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

## IV. *Respondent's Difficulty Does by His Own Indecision Grow*

Respondent persists in drawing a sheathed sword to attack a statute of limitations defense to an alleged abusive Son-of-BOSS sheltering transaction.[29]

Respondent may desire to repeal *Colony* in the name of *Brand X*. If so, he should decisively say as much. *SEC v. Chenery Corp.*, *supra* at 196 ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.").

Respondent declares in the final regulations' preamble that "The interpretation adopted by the Supreme Court in *Colony* represented that court's interpretation of the phrase ['omits from gross income'] but not the only permissible interpretation of it." T.D. 9511, 2011–6 I.R.B. at 455. Appealing to *Brand X* and asserting his privilege "to adopt another

---

*sioner*, 568 F.3d 767 (9th Cir. 2009). See *supra* note 16.

    *Grapevine* is therefore the only case thus far that both accepts *Colony* as controlling the interpretation of sec. 6501(e)(1)(A) and allows the Commissioner to reach a contrary result by regulation. "That the Supreme Court * * * [has] strongly reasoned for a certain interpretation of these statutes does not mean their inherent ambiguity has been wiped away." *Grapevine Imps., Ltd. v. United States*, *supra* at 1379. The contrast with the *Brand X* "caveat" of Justice Stevens, who had authored *Chevron* for a unanimous Supreme Court, that "a decision by this Court * * * would presumably remove any pre-existing ambiguity", *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, *supra* at 1003 (Stevens, J., concurring), could not be starker. Regardless, we respectfully disagree with the Court of Appeals for the Federal Circuit, which declined to classify *Colony* as a *Chevron* step one holding because "The Court did not find that there was no other reasonable interpretation" of the statutory language contained in current sec. 6501(e)(1)(A). *Grapevine Imps., Ltd. v. United States*, *supra* at 1379. For the reasons set forth *supra* notes 26 and 27 and the accompanying text, we believe *Colony* represents an explication of unambiguous congressional intent rather than a policy choice "resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities." *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. at 865–866. We decline to characterize *Colony*'s ascertainment of congressional intent ambiguous merely because the Supreme Court did not explicitly note that "it has reached, not only the right ('best') result, but 'the only permissible' result", *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. at 1018 (Scalia, J., dissenting), in an opinion handed down over a quarter of a century before *Chevron* was decided.

    [29] See also *supra* note 5 discussing respondent's denial of the retroactive character of the regulations.

reasonable interpretation of" that phrase, respondent equivocates in the next breath, by adding the proviso "particularly as * * * [that phrase] is used in a new statutory setting." *Id.* As discussed above, the Court of Appeals for the Ninth Circuit has rejected the proposition that section 6501(e)(1)(A) constitutes "a new statutory setting" for the phrase "omits from gross income".

The appeal to *Brand X* in the final regulations' preamble is further attenuated by a preceding statement that reiterates respondent's position that *Colony* "dealt with an omission from gross income in the context of a trade or business under the predecessor of section 6501(e)" and no longer "applies to sections 6501(e)(1) and 6229(c)(2)". *Id.*

"It will not do for a court to be compelled to guess at the theory underlying the agency's action". *SEC v. Chenery Corp.*, *supra* at 196–197. Even if we read the Supreme Court's recent *Mayo* opinion as a license to categorize most judicial constructions that discuss legislative history as *Chevron* step two decisions, respondent has yet to unabashedly accept the Court of Appeals for the Ninth Circuit's invitation and issue regulations that unequivocally repudiate the *Colony* holding. Unless and until he does so, his hands must remain tied.[30] Consequently, his discretion in interpreting section 6501(e)(1)(A), howsoever noble and worthy of deference, must remain circumscribed.

## V. *Conclusion*

When enacting section 6501(e)(1)(A) in 1954, Congress could not possibly have foreseen the development of the tax shelter industry and the use of complex devices, such as Son-of-BOSS transactions, which seek to artificially inflate bases of partnership assets to achieve tax alchemy. Much as we

---

[30] *Chenery* may demand less than crystal clarity of purpose, but at least when applied at *Chevron* step two it should require more than muddled thinking. *Chevron* deference appears incompatible with an agency asking a court to choose between two or more alternative validating grounds. See *Interstate Commerce Commn. v. Bhd. of Locomotive Engrs.*, 482 U.S. 270, 283 (1987) (holding that a court "may not affirm on a basis containing *any element of discretion*—including discretion to find facts and interpret statutory ambiguities—that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court" (emphasis supplied)). The agency, having invoked its discretion to fill statutory gaps by issuing regulations, cannot then surrender it by seeking validation of the regulations on any one of a number of competing grounds. See *Holland v. Natl. Mining Association*, 309 F.3d 808, 818 (D.C. Cir. 2002) (refusing to choose among several potential validating grounds because "*Chevron* deference is only appropriate where the agency's action represents its *reasoned judgment about the meaning of the statute.*").

may be tempted, we cannot speculate on how the Congress that enacted section 6501(e)(1)(A) would have meant it to apply in the present-day context. To paraphrase Justice Holmes, we do not inquire what the legislature would have meant. Cf. Holmes, "The Theory of Legal Interpretation", 12 Harv. L. Rev. 417, 419 (1899), reprinted in Collected Legal Papers 207 (1920) ("We do not inquire what the legislature meant; we ask only what the statute means."). In this case, we do not even ask what the statute means; we merely ask what the Court of Appeals for the Ninth Circuit and the Supreme Court have told us the statute means.

The Court of Appeals for the Ninth Circuit tells us that *Colony* controls the meaning of the phrase "omits from gross income" as it now appears in section 6501(e)(1)(A). *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d at 778. And the Supreme Court has told us, in *Colony*, that this phrase does not include an overstatement of basis. We thus hold that only a 3-year limitations period under section 6501(a) applies here. Consequently, we hold the FPAA issued after the expiration of this 3-year period to be untimely. We further hold petitioner's and the partners' consents executed after the FPAA was issued to be invalid. We will therefore grant petitioner's motion for summary judgment. The Court has considered all of respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

*An appropriate order and decision will be entered.*

Reviewed by the Court.

COLVIN, GOEKE, and KROUPA, *JJ*., agree with this opinion.

MARVEL, *J*., concurs in the result only.

GUSTAFSON and MORRISON, *JJ*., did not participate in the consideration of this opinion.

———————————

HALPERN and HOLMES, *JJ*., concurring:

I. *Introduction*

We have joined Judge Thornton's concurring opinion, which would grant petitioner's motion for summary judgment

on the ground of this Court's prior decisions consistently holding that our construction of section 6501(e)(1)(A) follows from the unambiguous terms of the statute. [1] That is a sufficient ground to dispose of this case and should end the matter. But the prevailing opinion [2] does not stop there. Without benefit of argument from the parties, Judge Wherry has addressed the final regulations, sections 301.6229(c)(2)–1 and 301.6501(e)–1, Proced. & Admin. Regs. (the final regulations), and found one reason to question them and two reasons to reject them. [3] First, he suggests ("assumptions not necessarily * * * [contradicted] here") that they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law', * * * [or not] issued in 'observance of procedure required by law'". Majority op. p. 388. Second, he classifies *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958) (*Colony*), as a *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (*Chevron*), step one holding, which is contradicted by, and thus renders invalid, the final regulations (as we held in *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211, 224 (2010) (*Intermountain*) with respect to the temporary regulations). See majority op. pp. 387, 391. Finally, assuming arguendo that *Colony* is a *Chevron* step two holding, he disqualifies the final regulations as violating the *Chenery* doctrine, *SEC v. Chenery Corp.*, 332 U.S. 194 (1947) (*Chenery*). Majority op. pp. 394–395.

---

[1] E.g., *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211, 224 (2010) (invalidating the temporary regulations, secs. 301.6229(c)(2)–1T, 301.6501(e)–1T, Temporary Proced. & Admin. Regs., 74 Fed. Reg. 49322–49323 (Sept. 28, 2009), on the ground that *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), is a *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) (*Chevron*), step one holding, which "'forecloses the agency's interpretation' of sections 6229(c)(2) and 6501(e)(1)(A)").

[2] Judge Wherry's report in this case was referred to the Court Conference by the Chief Judge pursuant to the authority of sec. 7460(b). It was reviewed by the Court Conference, and Judge Wherry's disposition of petitioner's motion for summary judgment prevailed because all of the Judges voting at the Court Conference either were for the report or concurred in the result. A majority of the voting Judges authoring or joining an opinion, however, agree with Judge Thornton that, to grant the motion, we should go no further than to reiterate our historical position that the statute unambiguously precludes respondent's interpretation.

[3] While we agree with Judge Thornton that there is no need to address the final regulations, it is because, as Judge Wherry notes, see majority op. note 3, "respondent can reasonably be expected to cite and rely on the final regulations * * * in any appeal" that we think it would be better to ask the parties their views on the validity of the final regulations before trying to hold them invalid. There are different standards for reviewing the procedural validity of temporary and permanent regulations, and there is some risk to both parties that we are making arguments neither would choose to make on his or its own.

We file this concurring opinion because of the prominence of the prevailing opinion. See *Bushnell v. Commissioner*, 49 T.C. 296, 311 (1967) (Raum, J., concurring) (concurring opinion filed to rebut theory relied on in prevailing opinion). We address the second two of Judge Wherry's three reasons, the first (unless one and the same with the *Chenery* reason) giving us nothing to grasp.

II. *Chevron Step One*

Judge Wherry classifies *Colony* as a *Chevron* step one decision principally on the basis of our analysis in *Intermountain*. Majority op. p. 391. In *Intermountain*, 134 T.C. at 223–224, we stated that, on the basis of its review of the legislative history of the predecessor to section 6501(e)(1)(A), the Supreme Court in *Colony* "concluded that Congress' intent was clear and that the statutory provision was unambiguous." The Supreme Court, we added, found in that section's legislative history the narrow purpose of extending the 3-year period of limitations only when a taxpayer had omitted an item of gross income. *Id.* at 224.[4] We concluded:

> In so holding, the Supreme Court found that the statute's legislative history clarified its otherwise ambiguous text and, as a result, explicated Congress' intent and the meaning of the statutory provision. Thus, the Supreme Court's opinion in *Colony, Inc. v. Commissioner*, *supra*, "unambiguously forecloses the agency's interpretation" of sections 6229(c)(2) and 6501(e)(1)(A) and displaces respondent's temporary regulations. See *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, * * * [545 U.S. 967, 983 (2005) (*Brand X*)]. Consequently, the temporary regulations are invalid and are not entitled to deferential treatment. [*Id.*; fn. refs. omitted.]

While the majority in *Intermountain* dutifully cited *Brand X*, it paid insufficient attention to the Supreme Court's specific instruction that "A court's prior judicial construction * * * trumps an agency construction * * * only if the prior

---

[4] Judge Wherry hints, majority op. note 23, that there might be different rules for resorting to legislative history in tax cases, citing with approval Prof. Livingston's 20-year-old observation that "The tax legislative process differs in several important respects from the model assumed in most interpretive theories." Livingston, "Congress, the Courts, and the Code: Legislative History and the Interpretation of Tax Statutes", 69 Tex. L. Rev. 819, 832 (1991). This may be true, but the Supreme Court unanimously warned us just earlier this year that "we are not inclined to carve out an approach to administrative review good for tax law only. To the contrary, we have expressly '[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action.'" *Mayo Found. v. United States*, 562 U.S. ___, ___, 131 S. Ct. 704, 713 (2011) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)).

court decision *holds* that its construction follows from the unambiguous terms of the statute". *Brand X*, 545 U.S. at 982 (emphasis added). Judge Wherry reads *Brand X* to allow a subsequent regulation to trump the holding of a case "only if an 'unwise judicial construction' represents a policy choice". Majority op. p. 393. This seems to be a unique reading of *Brand X*, which distinguishes between statutes that the courts have found ambiguous and those they have found unambiguous, see *Brand X*, 545 U.S. at 982, not between cases where judges self-consciously make policy choices and cases where they engage in the more pedestrian work of construing a statute's terms.

The appropriate focus of any application of *Brand X* is the prior opinion's holding, specifically whether it held that its interpretation of a provision "[followed] from the unambiguous terms of the statute".[5] That, in turn, raises two questions: (1) what exactly did the earlier court assert? and (2) does its assertion carry authority? "The first inquiry seeks meaning and asks: did this court assert that its interpretation was the only reasonable one? The second seeks authority and asks: was this assertion part of the case's holding?"[6] Both inquiries must yield positive answers in order for a court applying *Brand X* to find a step one holding.

*Colony* is a pre-*Chevron* case, and the Supreme Court did not have to decide whether its interpretation of the statute was the only reasonable one (i.e., that the statute was unambiguous, or clear) or merely the best one. The first inquiry, seeking meaning, is, for that reason, problematic when applied to *Colony*. It is even more so for us, a national, trial-level Court, because the Supreme Court has not spoken clearly on the issue of legislative history in the *Chevron* framework and the situation in the Courts of Appeals is muddled. See *Intermountain*, 134 T.C. at 232–236 (Halpern and Holmes, JJ., concurring in the result). *Brand X* signals an agency-deferential approach to statutory interpretation. Given the difficulties in trying to reclassify *Colony* within the *Chevron* framework, we too would be inclined to require either an explicit statement that the predecessor statute[7]

---

[5] This point is made in Note, "Implementing *Brand X*: What Counts as a Step One Holding?", 119 Harv. L. Rev. 1532, 1536 (2006).

[6] *Id.*

[7] Sec. 275(c), I.R.C. 1939.

was unambiguous or a holding dependent on such unambiguity,[8] before declining to give deference to the Secretary's contrary regulations.[9] We do not find either in *Colony* and, thus, if called upon to do so, would not find it a *Chevron* step one holding.[10]

III. *Chenery*

Supplementing our analysis in *Intermountain*, Judge Wherry addresses the contingency that we may have been wrong there in deciding that *Colony* is a *Chevron* step one holding. Even if it is not, he says, the Supreme Court's decision in *Chenery* would still invalidate the final regulations. Majority op. pp. 394–395. In *Bakersfield Energy Partners, LP v. Commissioner*, 568 F.3d 767, 778 (9th Cir. 2009), affg. 128 T.C. 207 (2007), the Court of Appeals for the Ninth Circuit implicitly brought into question *Colony*'s standing as a *Chevron* step one holding by suggesting that the Secretary may have authority to reinterpret the phrase "omits from gross income". Barring written stipulation to the contrary, this case is appealable to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1)(E), (2). Understandably, Judge Wherry may wish to be heard on that question. Unfortunately, his contribution—his conclusion that *Chenery* requires the Secretary to "unequivocally" repudiate *Colony* in his regulations, majority op. p. 396—will, if mistaken for the position of the Court, likely only cause us more trouble in our already nettlesome relationship with the Administrative Procedure Act (APA), 5 U.S.C. secs. 551–559, 701–706 (2006).

The problem is that the APA itself requires no "unequivocal" statement; it requires only "a concise general

---

[8] See *supra* note 5.

[9] An explicit-statement approach is suggested by the author in Case Comment, "Administrative Law—*Chevron* Deference—Federal Tax Court Holds Pre-*Chevron* Judicial Construction of Statute Precludes Subsequent Agency Interpretation if Prior Construction Was Premised on Legislative History.—*Intermountain Insurance Service of Vail, LLC v. Commissioner*, No. 25868–06, 2010 WL 1838297 (T.C. May 6, 2010)", 124 Harv. L. Rev. 1066, 1071 (2011).

[10] We recognize that the Courts of Appeals have addressed this issue and have reached varying results. *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368, 1378 (Fed. Cir. 2011) (ambiguous at *Chevron* step one); *Beard v. Commissioner*, 633 F.3d 616 (7th Cir. 2011) (inclined to give regulations *Chevron* deference), revg. T.C. Memo. 2009–184; *Burks v. United States*, 633 F.3d 347, 360 (5th Cir. 2011) (unambiguous at *Chevron* step one; *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249, 257 (4th Cir. 2011) (accord).

statement of * * * [the regulations'] *basis* and *purpose*." *Id.* sec. 553(c) (emphasis added).[11]

The Secretary did explain his *basis* for the final regulations. He recognized authority for his substantive view of a broad, general definition of gross income. T.D. 9511, 2011–6 I.R.B. 455, 456 ("outside of the trade-or-business context * * * the section 61 definition of gross income applies"). He referenced sections 7805 and 6230(k) as his authority for issuing the final regulations. *Id.* He disagreed with our holding in *Intermountain* that the Supreme Court's interpretation of the statutory phrase in question ("omits from gross income") in *Colony* was the only permissible interpretation, and, on the basis of that disagreement, he relied on *Brand X* as his authority for superseding that interpretation. *Id.*, 2011–6 I.R.B. at 455.

The Secretary also made his *purposes* clear: To supersede the, in his view, erroneous view of the Courts of Appeals for the Ninth and Federal Circuits that *Colony* is not limited to the trade or business context under the predecessor of section 6501(e)(1), *id.*, and to address *Intermountain*'s holding that the Supreme Court's interpretation in *Colony* is the only permissible interpretation of the statutory language ("omits from gross income") in sections 6229(c)(2) and 6501(e)(1)(A), *id.*

While Judge Wherry recognizes the Secretary's dual purposes of (1) limiting *Colony* to a trade or business circumstance and (2) failing that, establishing his authority under *Brand X* to supersede the Supreme Court's interpretation of the phrase "omits from gross income", he finds neither adequate. Majority op. p. 381. The first, he believes, attempts to usurp the courts' function of interpreting the Supreme Court's opinions. We agree. See *Bakersfield Energy Partners, LP v. Commissioner*, *supra*. The second, he believes, is fatally equivocal, principally because of the preamble's reference to "a new statutory setting." Majority op. p. 396. For him, that is an unacceptable ambiguity: does the Secretary really mean he can trump the Supreme Court's interpretation in *Colony*

---

[11] Judge Wherry is right, of course, that "*Chenery* sweeps wider than the Administrative Procedure Act's 'basis and purpose' requirement, * * * agency action can be upheld only on the ground previously advanced by the agency." Majority op. note 6. But there cannot be any other grounds in this case—never having asked respondent his views on the matter, he cannot possibly advance justifications in favor of the regulations different from those in the preamble to the regulations.

or is he reiterating his view that *Colony* is confined to the 1939 Code? Until the Secretary unequivocally takes the former position, *Chenery*, according to Judge Wherry, ties the Secretary's hands. Majority op. p. 396. We do not agree.

First, it must be kept in mind that the Secretary's reference to a new statutory setting arises only in the context of his rebuttal of our holding in *Intermountain* that the Supreme Court's opinion in *Colony* was the only permissible interpretation of the statute. Following the Secretary's recital of the Supreme Court's statement in *Colony* that the term "omits from gross income" is ambiguous, which he states "meaning * * * susceptible to more than one reasonable interpretation", he references *Brand X* and states that the Secretary and the IRS are permitted to adopt another reasonable interpretation of the term, "particularly as it is used in a new statutory setting." T.D. 9511, 2011–6 I.R.B. at 455. The Secretary does not say, e.g., "because of" or "in light of" that new setting. It seems to us that he was merely addressing what he saw as a flaw in our *Intermountain* analysis; viz, that the meaning the Supreme Court attached to the phrase "omission from income" in the 1939 Code necessarily attached to the same phrase in the 1954 Code. Tellingly, after stating his disagreement with *Intermountain*, the Secretary drives home his right to challenge it by citation: "See *Hernandez-Carrera v. Carlson*, 547 F.3d 1237 (10th Cir. 2008) (agencies are free to promulgate a reasonable construction of an ambiguous statute that contradicts any court's interpretation, even the Supreme Court's)." *Id.*, 2011–6 C.B. at 455–456. Why cite language of the, at the time, [12] only Federal appellate-level decision applying *Brand X* to a Supreme Court interpretation other than to try to overturn a Supreme Court interpretation?

Moreover, neither *Chenery* nor the APA requires crystal clarity of purpose. We think that it is reasonably clear from the preamble to the final regulations that the Secretary believes that, relying on *Brand X*, he can come to a different conclusion as to the meaning of section 6501 than the Supreme Court did in *Colony*. And despite Judge Wherry's assertions to the contrary, *Chenery* asks no more. He is right

---

[12] More recently, in validating the final regulations, the Court of Appeals for the Federal Circuit found the Supreme Court's opinion in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), to be ambiguous. *Grapevine Imps., Ltd. v. United States, supra*.

that under APA section 706(2)(A) the Secretary's findings cannot be arbitrary and capricious, majority op. p. 388, and we recognize that under that standard "the agency must examine the relevant data and *articulate a satisfactory explanation for its action*", *Motor Vehicle Manufacturers Association of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added). And although a court cannot provide a reasoned basis for the Secretary's decision if he did not, see *id.* (citing *Chenery*), a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned", *id.* (quotation marks omitted); see also *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010). The Secretary's *Brand X* rationale meets that standard, and that is enough. See, e.g., *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1146 (9th Cir. 2007) (though not "a paragon of clarity * * *, the Service's reasoning can be discerned with careful reading."); *Dominion Res., Inc. v. United States*, 97 Fed. Cl. 239, 259 (Feb. 25, 2011) (the Secretary's path could "be 'discerned,' albeit somewhat murkily"). We have no call to require more than that, with reasonable effort, the Secretary's intent can be discerned. See *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543–544, 548 (1978) (absent extremely compelling circumstances, courts should not overturn agency decisions when the statutory minimums have been met).

Finally, we recognize that, having accepted Judge Wherry's criticism of the Secretary's first rationale (limiting *Colony*) and rejected his criticism of the second (reliance on *Brand X*), we are left with a mixed basket of correct and incorrect rationales for an agency's decision, which might provide sufficient reason for a court to invalidate the agency's action. E.g., *Intl. Union, UMW v. U.S. Dept. of Labor*, 358 F.3d 40, 44–45 (D.C. Cir. 2004). But "[w]hen an agency relies on multiple grounds for its decision, some of which are invalid, * * * [we] may nonetheless sustain the decision as long as one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006) (internal quotation marks omitted); see also *Fed. Express Corp. v. Mineta*, 373 F.3d 112, 118 (D.C. Cir. 2004) ("No principle of administrative law or common sense requires us to remand

a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (internal quotation marks omitted)). [13] Because we believe that the Secretary's second rationale is independent of his first, we believe that he would stand behind his regulations on that ground alone.

IV. *Conclusion*

We have made clear that we would not characterize *Colony* as a *Chevron* step one holding. If called upon to do so, we would also find *Chenery* inapplicable. Nonetheless, since the temporary regulations are invalid per *Intermountain*, we have to concur with the Court's disposition of petitioner's motion for summary judgment.

––––––––––––––

THORNTON, *J*., concurring: This Court's prior decisions, beginning with *Bakersfield Energy Partners, LP v. Commissioner*, 128 T.C. 207 (2007), affd. 568 F.3d 767 (9th Cir. 2009), have consistently held, relying on *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), that its construction of section 6501(e)(1)(A) follows from the unambiguous terms of the statute. Moreover, our decision in *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211 (2010), accords with decisions of the Courts of Appeals for the Fourth and Fifth Circuits rendered after *Mayo Found. v. United States*, 562 U.S. ____, 131 S. Ct. 704 (2011). See *Burks v. United States*, 633 F.3d 347 (5th Cir. 2011); *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249 (4th Cir. 2011). The Courts of Appeals for the Federal and Seventh Circuits have rendered decisions to contrary effect. See *Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011); *Beard v. Commissioner*, 633 F.3d 616 (7th Cir. 2011), revg. T.C. Memo. 2009–184. Nevertheless, there is no

––––––––––

[13] Judge Wherry disagrees, believing we cannot choose between alternative grounds. See majority op. note 30. In support of this view, he cites *Holland v. Natl. Mining Association*, 309 F.3d 808 (D.C. Cir. 2002). But in *Holland*, the court was not weighing multiple rationales given by the agency. Instead, it remanded because it did not know whether the agency came to a decision on its own or left the reasoning to the Court of Appeals for the Eleventh Circuit, which had previously found against the agency. The court could not affirm if the basis for the decision was not the agency's. See *Interstate Commerce Commn. v. Bhd. of Locomotive Engrs.*, 482 U.S. 270, 283 (1987). But in this case, the Secretary, rather than this or any other court, supplied the reasons.

compelling reason for this Court to abandon its precedents in this case, which is appealable to the Court of Appeals for the Ninth Circuit. That court has affirmed *Bakersfield*, although without addressing the final regulations, which had not then been issued. Presumably that Court of Appeals and perhaps the Supreme Court will have future occasion to do so. But at least for now the prevailing opinion appropriately holds in this case that the regulations do not trump this Court's prior decisions. See *Natl. Cable & Telecomms. Association v. Brand X Internet Servs.*, 545 U.S. 967, 984 (2005).

COHEN, HALPERN, HOLMES, and PARIS, *JJ.*, agree with this concurring opinion.